UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY, LLC,

                         *Plaintiff*,

  v.

CHARLES BAXTER SOUTHERN III,


                         *Defendant*.

**Civil Action No.**

## COMPLAINT

       Plaintiff Marsh & McLennan Agency, LLC ("MMA" or the "Company"), by and through undersigned counsel, for its Complaint against Defendant Charles Baxter Southern III ("Defendant" or "Southern") alleges as follows:

## INTRODUCTION

       1.     Defendant Baxter Southern is a business thief.  Behind MMA's back and on its payroll, Southern executed a scheme to steal its lifeblood—employees, clients, confidential information, and trade secrets—to fuel his new venture, Howden US Specialty, LLC ("Howden US"). Southern's betrayal is staggering: he flagrantly violated his duty of loyalty and multiple contracts with MMA and its affiliates, all while cashing in on substantial compensation.

       2.     As a trusted employee of McGriff and later MMA for over 20 years, Southern led McGriff St. Louis and the McGriff Specialty Marine Team across multiple jurisdictions—teams that MMA acquired at significant expense in November 2024. Behind a smokescreen of loyalty to McGriff and its future within MMA, Southern accepted lucrative retention bonuses for himself while deliberately declining them for his teams. Meanwhile, he covertly planned their imminent departure to a competitor, aiming to capitalize on the fewer

restrictions that would apply to the employees he intended to bring along. Exploiting his privileged access to sensitive and confidential MMA employee and client information—including compensation details of MMA's employees—Southern orchestrated a mass exodus. In July 2025, Southern personally resigned with 17 other employees[1] under his direction to follow (collectively, the "McGriff Leavers") and successfully transferred a substantial portion of MMA's McGriff Specialty client base—clients with whom he had close ties during his tenure—to a new competitor, Howden US.

3. Southern's misconduct is undeniable and brazen. Mere days after his unexpected and abrupt resignation from MMA, the McGriff Leavers followed him *en masse* to Howden. One day they were all working for Southern at MMA; the next, they were under his command at Howden US. The McGriff Leavers based in St. Louis set up shop in Howden US's first St. Louis location—Southern's own basement—underscoring his direct role in the hostile raid on MMA's operations. Fully aware of the illegality of his actions, Southern went to great lengths to cover his tracks—ditching MMA's phone plan one week before his resignation to hide illicit communications, and orchestrating the destruction and misappropriation of MMA's confidential information and trade secrets by having the McGriff Leavers shred or steal sensitive documents.

4. As set forth further below, Southern's violations and breaches have substantially damaged MMA's goodwill and relationships with its clients and employees. Southern's unlawful conduct has resulted in the loss of 17 other employees in St. Louis and Houston (including nearly all of McGriff St. Louis) and over 30 clients as of today, representing over $4 million in annually recurring revenue (including nearly half of the Marine Team's total

---

[1]     Relevant to this action, the 17 employees defined herein as the McGriff Leavers include eight members of the Marine Team based in St. Louis, four members of the Marine Team outside of St. Louis, and five members of McGriff St. Louis who specialize in Business Insurance and claims. Each of the McGriff Leavers were members of the McGriff St Louis Office or Marine Team, led by Southern.

revenue), among other losses incapable of calculation – harm that will continue to mount unless and until Southern is restrained by this Court.

**PARTIES, JURISDICTION, AND VENUE**

5.      MMA is an insurance broker that provides business insurance, employee health and benefits and other insurance solutions and services to its clients. MMA operates brokerage offices across the United States. MMA is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in White Plains, New York.

6.      In November 2024, MMA completed the acquisition of McGriff, a significant move that expanded MMA's capabilities and market presence in the United States. This acquisition included McGriff's Specialty unit, which comprises teams of insurance professionals focused on complex client accounts operating in certain industry segments such as Marine, Energy and Construction.

7.      Within McGriff Specialty, Southern led the Marine Specialty Team ("Marine Team") and McGriff's St. Louis office ("McGriff St. Louis"). The integration with McGriff strengthened MMA's expertise and service offerings in industry specific insurance markets, enhancing its position in St. Louis and in the Marine insurance sector spanning multiple jurisdictions, all under Southern's leadership.

8.      Defendant Southern is an individual who, upon information and belief, resides in Clayton, Missouri. As a senior leader of McGriff St. Louis and the Marine Team, Southern had access to highly sensitive MMA confidential employee and client files, including detailed compensation information about each member of McGriff St. Louis and the Marine Team. Southern worked for MMA and its predecessors in St. Louis from January 2005 to July 21, 2025.

9.    On July 21, 2025, Southern abruptly resigned from MMA and immediately became employed by Howden US, in an identical role as the US Practice Head of Marine.

10.    Pursuant to 28 U.S.C. §§ 1332 and 1367, this Court has subject matter jurisdiction over this action because complete diversity exists between the parties, the amount in controversy exceeds $75,000.00, and because all supplemental state law claims arise out of the same case or controversy and derive from a common nucleus of operative facts.

11.    Additionally, and in the alternative, pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because at least one claim arises under the laws of the United States and the supplemental state law claims arise out of the same case or controversy and derive from a common nucleus of operative facts.

12.    Venue and personal jurisdiction are proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Southern expressly consented to the jurisdiction of state and federal courts located in New York County.  Further, upon information and belief, Southern transacts substantial business within the district as he maintains a non-resident insurance broker's license in the state of New York, which was renewed as recently as June 2025 at MMA's expense.

**FACTS**

13.    On November 15, 2024, MMA acquired McGriff at great expense, including all of McGriff's assets, contracts, and goodwill with its clients.

14.    Howden US Specialty, LLC was incorporated in Delaware on or about March 12, 2025.  Prior to that date, neither Howden US Specialty, LLC, nor its parent company Howden Group Holdings, Ltd. ("Howden Group"), had any insurance brokerage operations in the United States, much less a marine specialty practice.  Howden US Specialty, LLC registered in Missouri on October 14, 2025.

15.     Howden US, together with its affiliate Howden US Services, LLC, are direct competitors of MMA in the United States insurance brokerage market, where numerous players vie for market share across various segments.

16.     MMA made substantial investments in developing its employees and the confidential information and trade secrets they access to serve existing clients and acquire new ones.

17.     The insurance brokerage industry is relationship-based, relying heavily on individual producers' and account teams' ability to cultivate strong relationships with clients. The success of MMA's business depends on its goodwill and trust with its clients, its goodwill and trust with its employees, and its trade secrets and other confidential information.

18.     MMA protects its confidential and trade secret information, including, but not limited to, requiring its employees – including Southern – to sign confidentiality agreements that define MMA's confidential and trade secret information (which include clients' confidential information and confidential information related to MMA's employees) and describes the employees' obligation to safeguard MMA's confidential and trade secret information.

19.     Similarly, employee goodwill and trust are critical components of MMA's business. Over the years, MMA has invested substantial resources building a robust insurance brokerage business within Missouri and the rest of the United States, including with its acquisition of McGriff. MMA dedicates significant time and money to the training, coaching, mentoring, and professional development of their teams to retain them and help them succeed. MMA also provides generous compensation and incentives to foster high performance and attract and retain top talent.

### Southern's Tenure and MMA's Acquisition of McGriff

20.     Prior to his abrupt and improper departure, Southern was an employee of MMA and its predecessors for over 20 years. During the course of his employment, MMA and its

5

predecessors invested substantial resources to develop and financially support Southern to be able to attract and retain clients for McGriff St. Louis and the Marine Team he led.

21.    From November 15, 2024 forward, Southern was an employee of MMA and owed a duty of loyalty to MMA. MMA also became the successor in interest to agreements Southern executed with predecessor companies McGriff and Truist, including an Employment Agreement between Southern and McGriff dated January 26, 2005 ("Employment Agreement").

22.    Further, as the leader of the St. Louis office and the Marine Team, Southern had access to MMA's highly confidential and proprietary information, including MMA's trade secrets.  This included financial and business information related to MMA, McGriff, and the Marine Team; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed by MMA and McGriff over time and at considerable expense, including valuable non-public and historic client information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; and compilations of personnel information for McGriff St. Louis and the Marine Team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

### *Southern Executed Additional Restrictive Covenants*

23.    In connection with the MMA acquisition, Southern received substantial retention and incentive compensation awards.  These awards were contingent upon the signing of additional restrictive covenant agreements that supplemented the obligations he already agreed to in the Employment Agreement.

24.    On November 14, 2024, in connection with the awards of a book bonus and retention bonus, Southern executed, among other agreements, the Marsh & McLennan Agency

Non-Solicitation and Confidentiality Agreement (the "MMA NSA").

      25.    In Section 1 of the MMA NSA, Southern agreed regarding the non-solicitation of clients:

> (a) Employee acknowledges and agrees that solely by reason of employment by the Employer, including its predecessor McGriff, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of goodwill developed by Company with its clients.

> (b) Consequently, Employee covenants and agrees that in the event of separation from employment with the Employer, whether such separation is voluntary or involuntary, Employee will not, for a period of two (2) years following such separation, directly or indirectly: (i) solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Sections 1(b) (i)-(iii). For the avoidance of doubt, this restriction set forth in this Section 1 applies to those clients or prospective clients of the Company, including McGriff, and with which Employee had contact or about whom Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of this Section 1, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services, products or projects for the client on behalf of the Company. For purposes of this Section 1, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this Section has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities

26.     With respect to MMA's employees, Southern agreed in Section 2 of the MMA NSA:

> Employee acknowledges and agrees that solely as a result of employment with the Employer, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding other employees of the Company, and will develop relationships with those employees. Accordingly, both during employment with the Employer and for a period of two (2) years thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Employer, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets, to leave employment with the Company.

27.     In exchange for substantial compensation and to protect MMA's commercially valuable confidential and trade secret information, Southern also agreed to the Confidentiality and Non-Disparagement provision in Section 4 of the MMA NSA. Specifically, Southern agreed:

> (a)     The Employee agrees that he or she will not, during his or her employment with the Company, or at any time after such employment terminates, use for his or her own or another's purposes, or disclose to any other person or entity (other than in the proper course of employment with the Company) any Confidential Information. This Section 4(a) shall not apply to any part of such Confidential Information that comes into the public domain otherwise than by reason of an unauthorized disclosure; or that is disclosed to the Employee on a non-confidential basis by a third party who is not bound by a duty of confidentiality. "Confidential Information" includes but is not limited to: (i) financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures and new marketing ideas; (ii) product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models and research and development projects; (iii) client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with

which insurance is placed and leads and referrals to prospective clients; (iv) personnel information, such as the identity and number of the Company's other employees and officers, their salaries, bonuses, benefits, skills, qualifications and abilities; (v) any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices; (vi) any information not included in (i) or (ii) above which the Employee knows or should know is subject to a restriction on disclosure or which the Employee knows or should know is considered by the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public; or (vii) intellectual property, including inventions and copyrightable works. Confidential Information is not generally known or available to the general public, but had been developed, compiled or acquired by the Company at its effort and expense. Confidential Information can be in any form, including but not limited to: verbal, written or machine readable, including electronic files.

(b)    Immediately upon the termination of employment with the Company for any reason, or at any time the Company so requests, the Employee will return or provide to the Company: (i) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in the Employee's possession or control which contain or pertain to Confidential Information or trade secrets; (ii) all property of the Company, including, but not limited to, supplies, keys, access devices, cellphones, laptops, iPhones, iPads, books, identification cards, computers, telephones and other equipment; (iii) all passwords, passcodes, security PINs, biometrics, and/or any other information or means necessary for the Company to access property of the Company stored on any device or equipment in writing. The Employee further agrees not to take any action (such as wiping or deleting) at any time with respect to any electronic devices that would hinder the access of information by the Company. The Employee agrees that upon completion of the obligations set forth in this subparagraph, and if requested by the Company, the Employee will execute a statement declaring that he or she has retained no property of the Company or materials containing Confidential Information, nor has he or she supplied the same to any person, except as required to carry out his or her duties as an employee of the Company. A receipt signed by an Officer of the Employer itemizing the returned property is necessary to demonstrate that Employee has returned all such property to the Company.

(c)    The Employee acknowledges and agrees that Employee is not authorized to access and use the Company's computer systems and protected computers, including laptop computers and Company devices, and the data contained therein, for personal gain or to benefit third parties (other than in the course of the Employee's performance of services for the Company or as expressly and specifically authorized by the Company) and that any such access or use is unauthorized.

9

(d)     The Employee further agrees that, except as required by law, the Employee will not do or say (or omit to do or say) anything that is intended, or might reasonably be expected, to harm or disparage the Company or to impair its reputation, or the reputation of any of its services, products, officers or employees. This provision is not intended to abridge any obligations or rights otherwise provided by law.

28.     Additionally, Southern agreed regarding the relief in any action to enforce the MMA NSA to the following provisions in Section 10 of the MMA NSA:

(a)     In recognition of the fact that irreparable injury will result to the Company in the event of a breach by Employee of his or her obligations under Section 1, 2, 3, 4, 5, 6, 7 or 8 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, Employee acknowledges, consents and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (i) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee and (ii) recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, expenses and costs incurred by the Company in investigating or seeking to enforce the provisions of this Agreement.

(b)     The restrictive periods set forth in this Agreement (including those set forth in Sections 1, 2 and 5 hereof) shall not expire and shall be tolled during any period in which Employee is in violation of such restrictive periods, and therefore such restrictive periods shall be extended for a periods equal to the durations of Employee's violations thereof.

29.     Further, Section 12(a) of the MMA NSA states that the obligations present in Southern's Employment Agreement, including obligations related to the non-solicitation of clients and employees and the protection of MMA's confidential information, are not superseded, but instead supplemented by the MMA NSA.

30.     Section 15 of the MMA NSA designates New York as the choice of law to interpret and enforce the MMA NSA and the state and federal courts in New York County as the exclusive venue for "any action or proceeding with respect to this Agreement and Employee's employment" with MMA.  Southern expressly "agree[d] to the personal jurisdiction" of the

Southern District of New York.

31.    Section 19 of the MMA NSA obligated Southern for a period of two years post-termination to provide any future employer – such as Howden US Specialty, LLC – with a copy of the MMA NSA "prior to taking a position with such new employer."

32.    In addition to his Employment Agreement and the MMA NSA, Southern executed multiple other non-solicitation and non-disclosure agreements containing substantially similar obligations, with both MMA's predecessor-in-interest and MMA's ultimate parent company, in exchange for which Southern received substantial incentive compensation and restricted stock units.   All the aforementioned agreements remain active and binding upon Southern by operation of various survivability and integration provisions in the agreements.

33.    Southern accepted the lucrative benefits that these agreements were conditioned upon, but through his actions described herein, he deprived Plaintiff of its benefit of the bargain by breaching his obligations to MMA, thereby causing MMA substantial damage.

34.    The departure of Southern and the other McGriff Leavers in July 2025 was not an isolated event, but part of a larger raid on MMA's ultimate parent company, Marsh & McLennan Companies, Inc. and its affiliates including Marsh USA LLC, resulting in the departure of over 140 employees—approximately 40 from MMA, 17 of them led by Southern.  Litigation to enforce MMA's and its affiliates' valid and reasonable restrictive covenant agreements ensued.

35.    On September 18, 2025, in the action *Marsh USA LLC v. Parrish*, *et al.* (No. 1:25-cv-06208 (S.D.N.Y. 2025), Judge George B. Daniels of the United States District Court for the Southern District of New York, enforced a nearly identical non-solicitation agreement to Southern's and issued a preliminary injunction against several former executives of MMA's affiliate Marsh USA LLC, who breached their obligations to Marsh by joining Howden US under

circumstances very similar to Southern.

### *Southern's Misuse of McGriff's Wholesaler Relationship with Howden*

36.     For a significant portion of McGriff Specialty's complex accounts requiring insurance coverage in the London insurance markets, McGriff used Howden Group as its wholesaler broker. Southern had substantial contact with Howden Group (and/or its subsidiaries) through the broker/wholesaler relationship servicing McGriff Specialty clients. Southern, however, as an MMA employee, was obligated not to leverage that relationship for himself or use it to harm his employer. For example, Southern was obligated to not discuss or plan with Howden to poach entire business units from MMA or how to cut MMA out of its own client relationships.

37.     Southern's work with McGriff and MMA also meant that he would occasionally travel to London, where Howden Group was based, for meetings. At all times during Southern's employment with McGriff and MMA he was obligated to act solely as a representative of McGriff and MMA in these meetings.

38.     Upon information and belief, Howden Group sought to expand into the United States market by any means necessary. To those ends, Howden Group initially targeted a company, Risk Strategies, as an acquisition target to launch its United States strategy. Howden Group was unsuccessful in acquiring Risk Strategies, which was acquired by another company in Spring 2025.

39.     After the unsuccessful Risk Strategies acquisition, Howden Group Holdings turned its sights on building a U.S. business off the back of one of its largest and most successful competitors, Marsh & McLennan Companies, Inc. and its subsidiaries and affiliates (collectively, "Marsh McLennan"), including MMA.  Among other business units at Marsh McLennan, Howden Group eyed McGriff St. Louis and the industry-specific expertise of McGriff Specialty, including the Marine Team, both led by Southern, that MMA had just lawfully acquired.

40.     Leveraging the wholesale relationship between McGriff and Howden Group, key senior leaders of MMA's McGriff Specialty, including Southern, schemed with Howden Group to raid MMA from the inside.

41.     Southern not only planned to depart MMA himself, but during his active employment with MMA he plotted to help Howden Group launch its competing US venture. Upon information and belief, Southern used his business meetings in London with Howden to conspire against MMA while still employed by MMA.

42.     It is now clear that Southern grossly misused the relationship that McGriff and MMA cultivated with Howden Group and his attendance at meetings with Howden Group as an opportunity to improperly enrich himself, violating the trust placed in him by his employer. Between 2024 and 2025, upon information and belief, Southern used the broker/wholesaler business relationship as a front to solicit MMA's employees (including Southern himself) and clients away from MMA to newly launched Howden U.S. entities.

43.     In June 2025, Southern took a business trip to London to visit Howden Group's office. MMA paid for this trip believing it was a legitimate business trip for Southern in support of their wholesaler/broker relationship for MMA's clients.

44.     Upon information and belief, Southern used this trip to conspire and actively compete against his employer by finalizing his future employment with Howden US and crafting plans with Howden Group to solicit MMA's clients and employees to the new competitive venture. MMA has come to learn that Southern requested to stay longer in London to have additional meetings with Howden Group – all indicating Southern was finalizing plans to end his twenty-year tenure with McGriff and transition to Howden US, accompanied by nearly all the employees he led at McGriff St. Louis and many members of his Marine Team, as evidenced by

Southern's abrupt resignation and the subsequent departure of the McGriff Leavers just weeks later.

45.    Throughout late July and early August nearly 40 MMA employees, including Southern and the McGriff Leavers, abruptly resigned and moved to Howden US.  The McGriff Leavers did not apply for positions with Howden US themselves but were made offers by Howden Group under direction from Southern and other MMA leaders in violation of their restrictive covenant agreements and duty of loyalty – as indicated by the timing and coordination of the resignations.

### Southern's Disloyal Raid of MMA's Marine Business

Defendant's Duplicitous Solicitation of MMA's Employees

46.    On July 21, 2025, Southern resigned from his role at MMA "effective immediately."

47.    Tellingly, when Southern abruptly resigned, the McGriff Leavers were uncharacteristically not alarmed.

48.    In the days that followed, nearly all of McGriff St. Louis and a significant portion of the Marine Team, all led by Southern, resigned.  Upon information and belief, the McGriff Leavers became employed by Howden US, reporting once again to Southern.

49.    Southern, therefore, did not merely plan to leave MMA's employ but took steps in competition with his employer, MMA, since at least November 2024 – thereby breaching his common law duty of loyalty owed to MMA and various contractual obligations.

50.    For instance, in connection with MMA's acquisition of McGriff, Southern received lucrative retention awards and associated incentive compensation, in exchange for which he executed restrictive covenant agreements to protect MMA's confidential information, trade

secrets, and client goodwill. However, when asked which members of McGriff St. Louis and the Marine Team should also receive retention awards and related incentive compensation, Southern informed MMA that no such retention awards were necessary.

51.    Upon information and belief, Southern deprived his team of substantial compensation awards not because he and the team were committed to a long-term future with MMA as Southern had made it appear, but rather because Southern was already angling to move McGriff St. Louis and a significant portion of the Marine Team—employees and clients—to a competitor. As the leader, Southern knew that certain members of McGriff St. Louis and the Marine Team did not have agreements similar to his own that would provide for post-employment restrictive covenant obligations to MMA upon its closing of its acquisition of McGriff. Rather than take steps to secure such protection of his current employer's business by recommending retention bonuses with associated restrictive covenant agreements for his team, Southern declined.

52.    By depriving his team members of the sort of retention dollars that he accepted for himself, Southern could further the scheme by ensuring that certain members of his team were free from restrictive covenant obligations to MMA upon closing of its acquisition of McGriff. Further, upon information and belief, Southern is now actively exploiting his scheme to ensure his direct reports would lack restrictive covenants by directing his non-restricted reports at Howden to contact his restricted MMA clients on his behalf – in violation of his own post-employment obligations to MMA.

53.    Based on the timing and coordination of the mass resignations of the McGriff Leavers who reported to Southern, Southern violated his duty of loyalty and contractual obligations to MMA by abusing his access to MMA's confidential employee data, including explicit compensation information about the entire McGriff St. Louis office and the Marine Team,

for both of which he was ultimately responsible, and using that knowledge and power to recruit and encourage the McGriff Leavers to leave MMA to join him at Howden US Specialty.

54.     Knowing that it would be unlawful to recruit the McGriff Leavers out in the open, upon information and belief Southern took calculated steps to conceal his involvement.

55.     First, one week before his resignation, Southern requested to move from a McGriff cellular telephone plan to a personal plan for business, citing it would be beneficial for him to be on a family plan.  Unaware of any malintent, McGriff agreed, porting the telephone number to his personal plan, and agreeing to pay a portion of his personal plan expenses going forward.  A week later, on July 21, 2025, Southern abruptly resigned effective immediately.  The timing indicates that Southern not only was planning to leave MMA at that time, but also wanted to shield improper communications from his MMA and maintain a phone number already known to MMA's employees and clients.

56.     On the heels of Southern's resignation, Daniel Whiteside, Managing Director and Global Practice Leader of Howden Group (or its subsidiaries) in London, who worked closely with Southern on McGriff Specialty business in the UK market, began to contact members of McGriff St. Louis and the Marine Team by phone. On these calls, Mr. Whiteside made offers of employment on the spot – without any of these MMA employees needing to fill out applications, submit resumes, or interview.  Instead, Mr. Whiteside simply asked for the employees' personal emails to send written offers. Upon information and belief, offer letters were sent by email almost immediately after the calls ended.

57.     Mr. Whiteside appeared to know Confidential Information about the MMA employees, such as their personal contact details and compensation information, even though Mr. Whiteside had not worked closely with the majority of these MMA employees, as he did with

Southern. Upon information and belief, Southern provided this information to Howden, allowing Howden to strategically target certain employees and pre-prepare the offer letters for use immediately after contacting MMA employees.

58.     Additionally, upon information and belief, Mr. Whiteside knew exactly which employees to contact at MMA for key roles and to service the Marine Team's largest clients. Mr. Whiteside must have learned this confidential (and personally sensitive) information from someone within MMA, as none of the McGriff Leavers applied to Howden directly prior to being contacted. Upon information and belief, Southern, as the senior leader of McGriff St. Louis and the Marine Team, was that inside source.

59.     The offer letters transmitted by Mr. Whiteside, upon information and belief, were detailed, indicating each was prepared in advance using the MMA confidential compensation information to which Southern, as leader of McGriff St. Louis and the Marine Team, had access. The offer letters contained detailed compensation and benefits information, none of which was provided to Howden by the employees themselves, rather they appear to be based upon the MMA confidential information handed over by Southern.

60.     The offers of employment, upon information and belief, conditioned employment on the execution of restrictive covenants. Thus, the very same employees that Southern schemed to prevent executing an MMA restrictive covenant would now be restricted by Howden US's similar agreements.

61.     As a result of Southern's actions, the McGriff Leavers began to resign *en masse* to join Howden in July 2025, immediately following Southern's own departure. These employees included several of Southern's direct reports that he ensured would not have contractual post-employment restrictions by denying them retention bonuses in November 2024.

62.    Upon information and belief, the McGriff Leavers immediately began to work for Howden, with the St. Louis-based leavers working in the basement of Southern's own home – ensuring Southern's involvement and knowledge of all aspects of their work. Presently, the Howden St. Louis team – all former McGriff St. Louis employees – work out of a temporary office space in close quarters with Southern at the helm.

63.    After his resignation, Southern continued to recruit MMA's employees to join the new competitive venture he was helping Howden launch in the U.S.

Defendants' Solicitation of MMA Clients After the En Masse Resignation

64.    Upon information and belief, Southern timed his departure to coincide with certain client renewals in an effort to improperly sway those clients to join the competitive venture he was helping Howden US launch.

65.    Southern's rapid efforts to transfer MMA clients to the new Howden US venture appears deliberately aimed at harming MMA's ability to compete as, based on information and belief, Howden US is not yet equipped to provide the full scope of services to these clients that MMA was able to provide.  Remarkably, Howden US employees—specifically several of the McGriff Leavers who Southern ensured would not be restricted—audaciously requested that MMA continue delivering these client services, despite Southern having orchestrated the issuance of Broker of Record letters appointing Howden US Specialty as the clients' broker.  Southern knowingly solicited business away from MMA while aware that Howden was not prepared to meet client needs, demonstrating a willful and malicious intent to harm MMA.

66.    Upon information and belief, Southern has been directing his reports at Howden US to contact restricted clients and request that the clients execute a Broker of Record change from MMA to Howden US.

67.     Upon information and belief, Southern is orchestrating the solicitation of clients including by causing certain direct reports to engage in solicitations because they are not restricted due to his scheme to deprive them of retention bonuses and accompanying non-solicitation agreements in connection with MMA's acquisition of McGriff.

68.     Southern's actions violate his own restrictive covenants which prohibit him from directly or indirectly soliciting MMA's clients. Under the agreements he executed, Southern may not direct others to do what he is expressly prohibited from doing himself and cannot provide MMA Confidential Information, including such information about its clients, to others to enable them to do so.

69.     Southern also is violating his restrictive covenants by servicing MMA clients once they have issued Broker of Record letters.

70.     Southern also is directing others to violate the non-service provisions in their own restrictive covenants by having former MMA employees work on client accounts after Broker of Record letters are issued, despite their own agreements.

71.     Southern's failed attempts to distance himself from the violations of his restrictive covenants and the substantial damage he is causing MMA by acting through others have been exposed by emails from the restricted clients themselves.  At least two clients have copied Southern's former McGriff email address in responding to Howden outreach – confirming his direct involvement in the solicitation efforts on behalf of Howden.

72.     Further, given the close quarters of Howden US's St. Louis office– first in Southern's own basement and now a very small temporary office – it strains credulity to believe that Southern is not involved in the solicitation and servicing of MMA clients that were primarily tied to him at MMA and have now gone to Howden.

73.     As a result of both Southern's direct and indirect solicitations, MMA has lost approximately 36 of its clients to Howden to date. These clients include:

(a)     Client A notified MMA of a Broker of Record Change on July 31, 2025.

(b)     Client B notified MMA of a Broker of Record Change on August 3, 2025.

(c)     Client C notified MMA of a Broker of Record Change on August 12, 2025.

(d)     Client D notified MMA of a Broker of Record Change on August 13, 2025.

(e)     Client E notified MMA of a Broker of Record Change on August 13, 2025.

(f)     Client F notified MMA of a Broker of Record Change on August 13, 2025.

(g)     Client G notified MMA of a Broker of Record Change on August 13, 2025.

(h)     Client H notified MMA of a Broker of Record Change on August 13, 2025.

(i)     Client I notified MMA of a Broker of Record Change on August 13, 2025.

(j)     Client J notified MMA of a Broker of Record Change on August 14, 2025.

(k)     Client K notified MMA of a Broker of Record Change on August 14, 2025.

(l)     Client L notified MMA of a Broker of Record Change on August 14, 2025.

(m)     Client M notified MMA of a Broker of Record Change on August 15, 2025.

(n)     Client N notified MMA of a Broker of Record Change on August 15, 2025.

(o)     Client O notified MMA of a Broker of Record Change on August 18, 2025.

(p)     Client P notified MMA of a Broker of Record Change on August 18, 2025.

(q)     Client Q notified MMA of a Broker of Record Change on August 20, 2025.

(r)     Client R notified MMA of a Broker of Record Change on August 21, 2025

(s)     Client S notified MMA of a Broker of Record Change on August 18, 2025.

(t)     Client T notified MMA of a Broker of Record Change on August 28, 2025.

(u)     Client U notified MMA of a Broker of Record Change on September 2, 2025.

(v)    Client V notified MMA of a Broker of Record Change on September 3, 2025.

(w)    Client W notified MMA of a Broker of Record Change on September 3, 2025.

(x)    Client X notified MMA of a Broker of Record Change on September 3, 2025.

(y)    Client Y notified MMA of a Broker of Record Change on September 8, 2025.

(z)    Client Z notified MMA of a Broker of Record Change on September 11, 2025.

(aa)    Client AA notified MMA of a Broker of Record Change on September 15, 2025.

(bb)    Client BB notified MMA of a Broker of Record Change on September 18, 2025.

(cc)    Client CC notified MMA of a Broker of Record Change on September 24, 2025,

(dd)    Client DD notified MMA of a Broker of Record Change on September 25, 2025.

(ee)    Client EE notified MMA of a Broker of Record Change on September 25, 2025.

(ff)    Client FF notified MMA of a Broker of Record Change on September 25, 2025.

(gg)    Client GG notified MMA of a Broker of Record Change on September 25, 2025.

(hh)    Client HH notified MMA of a Broker of Record Change on September 30, 2025.

(ii)    Client II notified MMA of a Broker of Record Change on October 1, 2025.

(jj)    Client JJ notified MMA of a Broker of Record Change on October 7, 2025.

74.     Further, at least one of MMA's clients was solicited by Southern through his direct reports at Howden but decided to remain with MMA rather than move to Howden.

75.     To date, Southern's actions have harmed MMA by depriving it of over $4 million in annual recurring revenue – amounting to nearly half of the annually-recurring revenue of MMA's Marine Team. Southern appears to have targeted the Marine Team's largest clients. Southern's solicitation campaign will continue to grow unless he is enjoined or otherwise restrained from further direct and indirect client solicitation and servicing.

### *Defendants' Misappropriation of MMA's Trade Secrets and Confidential Information*

76.     Prior to Southern's resignation, the McGriff Leavers who were solicited by Southern or with Southern's involvement, intentionally destroyed confidential MMA including by shredding paper files. Upon information and belief, this shredding campaign was designed both to deny MMA access to its confidential information, which it developed through extensive effort and investment, and to disguise any confidential information the McGriff Leavers took with them.

77.     Upon information and belief, these actions were either directed by or conducted with the approval of Southern.

78.     Upon information and belief, Southern told the McGriff Leavers around the time of his and their July 2025 resignations that they were not to take MMA's information with them—but, he noted, if they did, he did not want to know about it.  With a nod and a wink, Southern implicitly approved his direct reports to take what they needed, as long as they kept him willfully blind, and destroy the rest. When they left MMA, the McGriff Leavers left behind empty offices and no unshredded paper files.

79.     Upon information and belief, Southern is still in possession of MMA's Confidential Information within his personal email files. After his resignation, MMA learned that

Southern often would use his personal devices and personal email to edit MMA documents. These documents are still within Southern's personal email account and, upon information and belief, are being used to unfairly compete against MMA.

80.     Further, an analysis of Southern's digital footprint reveals that he was accessing McGriff's Box account and SharePoint folders until only days before his departure. Given the timing of the mass resignations, Southern's actions to position his team from being free of restrictive covenants, Southern's request to use his personal device for work on July14, 2025, the shredding of Confidential Information, and Southern's trip to London in late June 2025, Southern's mid-July 2025 access to these accounts and folders were for an improper purpose. Notably, Southern accessed his headshots on July 9, 2025, indicating that he had decided to leave MMA's employ no later than July 9, 2025.

81.     Southern owed common law duties to MMA to safeguard and protect its Confidential Information and agreed to many confidentiality obligations throughout his employment by MMA and its predecessor McGriff. By not returning or destroying Confidential Information in his personal email, allowing or encouraging his direct reports to take or destroy Confidential Information, and improperly accessing and copying information in the days leading up to his resignation, Southern breached his common law and contractual obligations.

### *Harm Being Caused by Defendants' Misconduct*

82.     Southern's actions have caused substantial damage to MMA overall, and to McGriff St. Louis and the Marine Team in particular.

83.     To date, Southern's actions have led to irreparable and incalculable loss for MMA, including loss of annually recurring client revenue of over $4 million in annual recurring revenue, and if his actions continue unchecked, that damage from soliciting MMA's clients and

employees in violation of his agreements will continue to grow.

## FIRST CAUSE OF ACTION
### (Breach of Contract, Non-Solicit of Employees – Individual Employees)

84.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

85.    The Employment Agreement, MMA NSA, and other agreements signed by Southern during his employment with MMA and its predecessors each constitute a valid, enforceable, and binding contract between the Southern and MMA.

86.    In exchange for agreeing to the reasonably tailored restrictive covenants and/or in return for bonus, retention, and incentive payments, Southern accepted employment with MMA and received substantial compensation from MMA and its parent company, access to MMA's trade secrets and other confidential information, and was entrusted with MMA's client and employee relationships and goodwill.

87.    Through his conduct described above, Southern breached his obligations under his respective agreements, including but not limited to, by soliciting and recruiting Plaintiff's employees who have their own independent contractual obligations to MMA.

88.    The breach of Southern's agreements is damaging MMA in at least the following ways:

a.   Loss of revenue and profits;

b.   Damage to Plaintiff's relationship with its employees;

c.   Damage to Plaintiff's other business relationships, including relationships with its clients and prospective clients;

d.   Impairment of Plaintiff's goodwill;

e.   Continued misappropriation and misuse of Plaintiff's confidential information

and trade secrets, and,

f.   Interference with Plaintiff's ability to operate its business.

89.    As a direct and proximate result of the foregoing actions of Southern, Plaintiff has suffered damages in an amount which is presently unascertainable, but is at least $4 million, plus interest and attorney fees, for which Southern is liable.

90.    Upon information and belief, Southern is continuing to violate the covenants contained in the Employment Agreement, MMA NSA, and other agreements, and unless enjoined by this Court, Southern will continue to do so.

91.    As a result of the foregoing actions of Southern and his breaches of the Employment Agreement, MMA NSA, and other agreements, MMA has and will continue to suffer irreparable harm.

92.    MMA has no adequate remedy at law to prevent these breaches of contract or injuries.

93.    Accordingly, MMA is entitled to an injunction prohibiting Southern from violating the terms of his various agreements.

## SECOND CAUSE OF ACTION
### (Breach of Contract, Non-Solicit and Non-Servicing of Clients)

94.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

95.    The Employment Agreement, MMA NSA, and other agreements signed by Southern during his employment with MMA and its predecessors each constitute a valid, enforceable, and binding contract between Southern and MMA.

96.    In exchange for agreeing to the reasonably tailored restrictive covenants and/or in return for bonus, retention, and incentive payments, Southern accepted employment with

MMA and received substantial compensation from MMA and its parent company, access to MMA's trade secrets and other confidential information, and was entrusted with MMA's client and employee relationships and goodwill.

97.    Through his conduct described above, Southern breached his obligations under his agreements, including but not limited to, by soliciting and servicing MMA's clients.

98.    Southern's breach of his agreements is damaging MMA in at least the following ways:

a.    Loss of revenue and profits;

b.    Damage to Plaintiff's relationship with its employees;

c.    Damage to Plaintiff's other business relationships, including relationships with its clients and prospective clients;

d.    Impairment of Plaintiff's goodwill;

e.    Continued misappropriation and misuse of Plaintiff's confidential information and trade secrets, and,

f.    Interference with Plaintiff's ability to operate its business.

99.    As a direct and proximate result of the foregoing actions of Southern, Plaintiff has suffered damages in an amount which is presently unascertainable, but is in excess of $4 million, plus interest and attorney fees, for which Southern is liable.

100.    Upon information and belief, Southern is continuing to violate the covenants contained in the Employment Agreement, MMA NSA, and other agreements, and unless enjoined by this Court, Southern will continue to do so.

101.    As a result of the foregoing actions of Southern and his breaches of the Employment Agreement, MMA NSA, and other agreements, MMA has and will continue to suffer

irreparable harm.

102.    MMA has no adequate remedy at law to prevent these breaches of contract or injuries.

103.    Accordingly, MMA is entitled to an injunction prohibiting Southern from violating the terms of his various agreements.

### THIRD CAUSE OF ACTION
**(Breach of Contract, Confidential Information and Trade Secrets)**

104.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

105.    The Employment Agreement, MMA NSA, and other agreements signed by Southern during his employment by MMA and its predecessors each constitute a valid, enforceable, and binding contract between Southern and MMA.

106.    In exchange for agreeing to the reasonably tailored restrictive covenants and/or in return for bonus, retention, and incentive payments, Southern accepted employment with MMA and received substantial compensation from MMA and its parent company, access to MMA's trade secrets and other confidential information, and was entrusted with MMA's client and employee relationships and goodwill.

107.    Through his conduct described above, Southern breached his obligations under his respective agreements, including but not limited to, by disclosing, using, and destroying MMA's confidential information and trade secrets.

108.    The breaches of Southern's agreements are damaging MMA in at least the following ways:

a.   Loss of revenue and profits;

b.   Damage to Plaintiff's relationship with its employees;

c.  Damage to Plaintiff's other business relationships, including relationships with its clients and prospective clients;

d.  Impairment of Plaintiff's goodwill;

e.  Continued misappropriation and misuse of Plaintiff's confidential information and trade secrets, and,

f.  Interference with Plaintiff's ability to operate its business.

109.    As a direct and proximate result of the foregoing actions of Southern, Plaintiff has suffered damages in an amount which is presently unascertainable, but is in excess of $4 million, plus interest and attorney fees, for which Southern is liable.

110.    Upon information and belief, Southern is continuing to violate the covenants contained in the Employment Agreement, MMA NSA, and other agreements, and unless enjoined by this Court, Southern will continue to do so.

## FOURTH CAUSE OF ACTION
### (Missouri Trade Secret Claim)

111.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

112.    As described above, Plaintiff is the owner of valuable trade secrets within the meaning of the Missouri law that it has developed through its efforts and investments in relationships with customers and employees. Additionally, as described above, MMA expends great effort in protecting these commercially valuable trade secrets.

113.    Each of these trade secrets was confidential and commercially valuable at the time of the misappropriation because they gave Plaintiff a competitive advantage in the market by virtue of not being public. If a competing brokerage company obtained this information, that company would be at a competitive advantage over Plaintiff because it could target Plaintiff's

customers and undercut Plaintiff's sales using information that would not otherwise be available to the public.

114.    Each of Plaintiff's trade secrets described above derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use, including Defendant. To the extent that certain elements of the trade secrets identified above are individually publicly available, Plaintiff compiled those detailed records over a significant period of time and organized them so that they could be accessed and used efficiently in its business endeavors to its commercial advantage.

115.    Upon information and belief, Southern knew or should have known that the trade secrets at issue were in fact, trade secrets.

116.    Each of Plaintiff's trade secrets described above is the subject of efforts by Plaintiff that are reasonable under the circumstances to maintain its secrecy.

117.    Upon information and belief, Southern, as a trusted and senior leader and head of McGriff St. Louis and the Marine Team, acquired and is now improperly using Plaintiff's trade secrets outside the scope of the authority or consent provided to Southern by Plaintiff in connection with his employment.

118.    Upon information and belief, Southern misappropriated Plaintiff's trade secrets in Missouri through his retention, destruction, conversion, and/or use of those trade secrets for Howden.

119.    The evidence of Southern's misappropriation of Plaintiff's trade secrets is already apparent in Southern's conversion of at least 36 of Plaintiff's customers to Howden: his knowledge of Plaintiff's trade secret information about these customers (including, without

limitation MMA's confidential client files, and their strategic importance to Plaintiff, was only possible due to their misappropriation. A full inventory of the trade secrets misappropriated by Southern is not available at this juncture due to the wholesale destruction of the St. Louis office's confidential files. Additionally, Southern misappropriated Plaintiff's confidential and trade secret information regarding its employees.

120.    As a direct and proximate result of Southern's willful and malicious misappropriation of Plaintiff's trade secrets, Plaintiff is entitled to an award of actual damages, including but not limited to, the value of the unjust enrichment caused by Defendant's misappropriation and benefit therefrom in an amount which is presently unascertainable, but is in excess of $4 million, plus interest and attorney fees, for which Southern is liable.

121.    As a direct and proximate result of Defendant's willful and malicious misappropriation of Plaintiff's trade secrets, Plaintiff also seeks an award of punitive damages to be decided by the jury.

122.    As a direct and proximate result of Defendant's willful and malicious misappropriation of Plaintiff's trade secrets in bad faith, Plaintiff also seek an award of attorneys' fees and costs, including costs incurred in conducting the extensive forensic investigations that have been and will be required to determine the full scope of misappropriation.

123.    In addition to economic damages, unless Defendant is enjoined from using or disclosing Plaintiff's trade secrets, Plaintiff will suffer immediate and irreparable injury, including the irreversible loss of its confidential and trade secret information, its competitive position and advantage in the marketplace, and associated harm to its market share, reputation, and goodwill. Plaintiff seeks a permanent injunction against Defendant's ongoing wrongful conduct and threatened or actual misappropriation.

**FIFTH CAUSE OF ACTION**
**(Trade Secret Misappropriation Under the Defend Trade Secrets Act,**
**18 U.S.C. §1836)**

124.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

125.    Southern violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. (the "DTSA") by misappropriating trade secrets from MMA for services used in, or intended for use in, interstate or foreign commerce.

126.    Southern possesses or through his action or inaction destroyed MMA's trade secrets under the Defend Trade Secrets Act in the form of, at a minimum MMA's confidential client files – though a full inventory is not possible due to the wholesale destruction by shredding of MMA's St. Louis office files. Additionally, Southern misappropriated Plaintiff's confidential and trade secret information regarding its employees.

127.    MMA's and MMC's confidential and trade secret information relate to services used in, or intended to be used in, conducting business throughout the United States and the globe.

128.    Upon information and belief, Southern is using and will continue to use MMA's trade secrets to conduct business.

129.    MMA invested substantial time and resources to generate such information that Southern misappropriated. The information contained in the misappropriated materials derives independent economic value by virtue of not being known or available to the public. MMA has kept this information sufficiently secret to give it a competitive advantage. Southern has taken affirmative measures to prevent others from acquiring it or using it by means, as described above.

130.    Due to his position working for a direct competitor of MMA, and his

possession of MMA's trade secrets and confidential and proprietary information, there is a substantial likelihood that Southern has disclosed or used, and will continue to use, MMA's trade secrets.

131.    As a direct and proximate result of Southern's unlawful conduct, MMA has been irreparably damaged, and Southern has been unjustly enriched. This unjust enrichment includes value attributable to the misappropriated information, amounts that Southern saved in costs and development by using the misappropriated information, and increased productivity resulting from the use of the misappropriated information and increased market share.

132.    The exact amount of these damages and unjust enrichment is not presently ascertainable but is believed to be in excess of $4 million, plus interest and attorney fees, for which Southern is liable. increasing each month.

133.    The acts described above constituted willful and malicious misappropriation in that Southern stole an alarming amount of Confidential Information and trade secrets and did so with the deliberate intent to injure MMA's business and improve Southern's and Howden's own businesses.

134.    Accordingly, MMA are entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1836 and exemplary damages under 18 U.S.C. § 1836.

135.    As a direct and proximate result of Southern's conduct and continued use of MMA's misappropriated trade secrets, MMA has suffered and will continue to suffer extensive injury and harm to its business.

136.    As a direct and proximate result of Southern's conduct MMA already suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this

litigation, and lost business, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

137.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

138.    By virtue of his role as trusted employee and senior leader, Southern owed a fiduciary duty to MMA, including but not limited to a duty of loyalty.

139.    Within the scope of his employment, MMA entrusted Southern to interact with current and prospective clients on its behalf.

140.    MMA also entrusted Southern with confidential and trade secret information for the sole purpose of enabling him to perform his job responsibilities.

141.    Southern owed MMA a duty not to exploit his access to MMA's clients, prospective clients, and confidential and trade secret information to advance his own or Howden Group's.

142.    Upon information and belief, while still employed by MMA and thereafter, Southern provided Howden Group and/or Howden US with information regarding MMA's clients and prospective clients and MMA's employees.

143.    By his conduct, Southern violated his duty of loyalty to MMA.

144.    By his conduct, Southern damaged MMA's reputation and goodwill.

145.    MMA is entitled to recover from Southern all monies paid to him during any periods of disloyalty, as a faithless servant.

146.    Southern has acted with intentional, malicious and/or wanton disregard of MMA's rights, and his conduct was so outrageous so as to warrant the imposition of punitive damages.

147.    As a direct and proximate result of the foregoing actions of Southern, Plaintiff has suffered damages in an amount which is presently unascertainable, but is in excess of $4 million, plus interest and attorney fees, for which Southern is liable.

**SEVENTH CAUSE OF ACTION**
**(Unfair Competition)**

148.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

149.    By virtue of the conduct as alleged herein, Southern has intentionally, knowingly and maliciously competed unfairly with MMA, including but not limited to his conduct in using and/or disclosing MMA's confidential information and trade secrets to solicit clients or employees.

150.    Southern has acted with intentional, malicious and/or wanton disregard of MMA's rights.

151.    As a direct and proximate result of Southern's conduct, MMA has suffered damages in an amount which is presently unascertainable, but is in excess of $4 million, plus interest, attorney fees, and exemplary damages, for which Southern is liable.

152.    Unless enjoined by this Court, Southern will continue to engage in unfair competition against MMA.

153.    MMA has no adequate remedy at law to prevent this irreparable harm.

154.    Accordingly, MMA is entitled to an injunction prohibiting Southern from continuing to engage in unfair competition against it.

**CONCLUSION**

WHEREFORE, Plaintiff, having fully complained, prays for judgment against Defendant with the following particular relief:

A.      Judgment in favor of Plaintiff and against Defendant on all causes of action alleged in the Complaint in an amount in excess of $4 million;

B.      Judgment against Defendant, and those acting in privity or concert with him, for temporary followed by permanent injunctions;

C.      Other equitable relief in a form to be requested;

D.      An award of actual, general, compensatory, incidental, consequential, and special damages recoverable under law, in an amount to be determined at trial;

E.      An award of punitive and exemplary damages recoverable under law, in an amount to be determined at trial;

F.      An award of attorneys' fees and costs associated with bringing and prosecuting this action;

G.      An award of pre-judgment and post-judgment interest; and,

H.      Such other and further relief as this Court deems just and proper.

Dated: New York, New York
          October 31, 2025

Respectfully submitted,

**JACKSON LEWIS P.C.**

BY:

Clifford R. Atlas
Paige C. Goldberg
666 Third Avenue, 28th Floor
New York, NY 10017
Telephone: (212) 545-4000
Facsimile: (212) 972-3213
clifford.atlas@jacksonlewis.com
paige.goldberg@jacksonlewis.com

*Attorneys for Plaintiff*

4928-2324-7734, v. 2